# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| FREDREKA M. GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:05 CV 43 ERW (LMB) |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the applications of Fredreka M. Green for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act.

The cause was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b).  Plaintiff has filed a Brief in Support of

Complaint (Document Number 15).   Defendant has filed a Brief in Support of the Answer.

(Doc. No. 16).

## Procedural History

On February 7, 2003, plaintiff filed her application for Disability Insurance Benefits and

Supplemental Security Income, claiming that she became unable to work due to her disabling

- 1 -

condition on July 8, 2002.[1]  (Tr. 70-72).  This claim was denied initially, and following an

administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law

Judge (ALJ), dated July 7, 2004.  (Tr. 35, 58-61, 8-16).  Plaintiff then filed a request for review

of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA),

which was denied on September 16, 2004.  (Tr. 6, 3-5).  Thus, the decision of the ALJ stands as

the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A.  ALJ Hearing

Plaintiff's administrative hearing was held on September 30, 2003. (Tr. 228).  Plaintiff was

present and was represented by counsel.  (Id.).  The ALJ began by admitting a number of exhibits

into evidence.  (Id.).  Plaintiff's attorney then examined plaintiff, who testified that she was 23

years of age, right-handed, five-feet-four-inches tall, and weighed 275 pounds.  (Tr. 229-30).

Plaintiff stated that she had recently gained about 50 pounds because she has been unable to

participate in activities due to her injury.  (Tr. 230).  Plaintiff testified that she lives with her

mother in a third-floor apartment.  (Id.).  Plaintiff stated that there are not many steps leading to

her apartment.  (Id.).  Plaintiff testified that she has no children, she has never been married, and

she has never been in the military.  (Id.).  Plaintiff stated that she finished the twelfth grade and

that she is a Certified Nursing Assistant (CNA).  (Tr. 230-31).  Plaintiff testified that she has no

other education or technical training other than the CNA.  (Tr. 231).  Plaintiff explained that she

attended community college but did not complete a semester.  (Id.).

---

[1]Plaintiff filed a prior application for benefits under Titles II and XVI, which was denied at
the reconsideration level on January 16, 2001.  (Tr. 13).

Plaintiff testified that she last worked in October of 2002 at the Lutheran Home, a nursing home, doing laundry. (Id.). Plaintiff stated that she was terminated because she was unable to perform her duties. (Tr. 232). Plaintiff testified that she was unable to sit continuously folding clothes as the job required because of the pain in her lower back and right leg. (Id.). Plaintiff stated that she experiences pain in her right leg that radiates down to her toes. (Id.). Plaintiff testified that she has been experiencing this pain since March of 2002. (Id.). Plaintiff stated that she first complained of dull pain in her back to her doctor in March of 2002, and that her doctor eventually sent her to physical therapy. (Tr. 232-33). Plaintiff testified that she attended physical therapy for a few months, which did not provide any relief. (Tr. 233). Plaintiff stated that her doctor then recommended that she either discontinue working or lie down with a pillow between her legs at work. (Id.).

Plaintiff testified that she then went to see a second doctor, Dr. David Catron. (Id.). Plaintiff stated that Dr. Catron took x-rays and found spondylolisthesis.[2] (Id.). Plaintiff stated that Dr. Catron sent her back to physical therapy. (Id.). Plaintiff testified that Dr. Catron told her that she would not feel the symptoms of the spondylolisthesis until she sustains a fall. (Id.). Plaintiff stated that her pain increased and began to radiate down her leg after she returned to physical therapy. (Tr. 234). Plaintiff testified that her physical therapist at Jackson Physical Therapy in Jackson, Missouri told her that she should stop working. (Id.).

Plaintiff testified that Dr. Catron scheduled her for an MRI[3] in July of 2002. (Id.).

---

[2]Forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. Stedman's Medical Dictionary, 1678 (27th Ed. 2000).

[3]Abbreviation for magnetic resonance imaging. Stedman's at 1135.

Plaintiff stated that after viewing the results of the MRI, Dr. Catron referred her to a

neurosurgeon. (Id.). Plaintiff testified that she never saw the neurosurgeon.[4] (Id.). Plaintiff

stated that she next saw Dr. August Ritter, who recommended that she stop working. (Tr. 234-

35). Plaintiff testified that the last physicians she has seen are Dr. Daniel Kitchens and Dr. Ronald

Hertel. (Tr. 235). Plaintiff stated that they recommended surgery, but told her that she has to

lose about 110 pounds and quit smoking before she could undergo surgery. (Id.). Plaintiff

testified that she has cut back her smoking from one package of cigarettes a day to about five

cigarettes a day. (Tr. 236).

Plaintiff testified that she experiences increased pain when she sits too long, stands too

long, walks, and does not take her medication as directed. (Id.). Plaintiff stated that her

medications, which include Ultracet,[5] Skelaxin,[6] and Advil, provide some relief for her pain. (Id.).

Plaintiff testified that her pain increases when she sits longer than 35 to 40 minutes. (Id.).

Plaintiff stated that she has to either get up and stretch or lie down when she sits too long.

(Tr. 237). Plaintiff testified that she can only stand for about 40 minutes. (Id.). Plaintiff stated

that she can walk for five to ten minutes. (Id.). Plaintiff testified that she does not want to take

too much prescription medication. (Id.). Plaintiff stated that her medications cause her to

become drowsy and make her nervous. (Id.). Plaintiff testified that she has been taking Ultracet

---

[4]The record reveals that plaintiff did see a neurosurgeon, Dr. Daniel L. Kitchens, on
multiple occasions. (Tr. 187-91, 204).

[5]Ultracet is indicated for the short-term management of acute pain. See Physician's Desk
Reference (PDR), 2550 (59th Ed. 2005).

[6]Skelaxin is indicated for the relief of discomforts associated with acute, painful
musculoskeletal conditions. See PDR at 1793.

and Skelaxin since February 2003.  (Id.).

Plaintiff testified that she experiences difficulty with balance due to her leg impairment.

(Tr. 238).  Plaintiff stated that she holds onto rails to maintain her balance when walking.  (Id.).

Plaintiff testified that she had to leave her home in Cape Girardeau, Missouri and move in with her

mother in Jefferson City, Missouri, due to her impairments.  (Id.).  Plaintiff stated that she drives

to the store, which is only a few blocks away.  (Tr. 239).  Plaintiff testified that she drove to the

hearing from Jefferson City, although she had to stop during the drive to use the restroom.  (Id.).

Plaintiff stated that she puts padding on her lower back for comfort when she has to ride in the car

for long periods.  (Tr. 239-40).  Plaintiff testified that she experiences some difficulty bending.

(Tr. 240).  Plaintiff stated that she does not visit with friends or relatives and that she does not

belong to any kind of church group or club.  (Id.).  Plaintiff testified that she now has to sit down

when combing her hair, and that she takes showers instead of baths because it is difficult for her

to get in and out of the bath tub.  (Tr. 241).

Plaintiff stated that she sweeps the floor and cleans tables, and that she washes dishes

while sitting down.  (Id.).  Plaintiff testified that she also does very light loads of laundry.

(Tr. 242).  Plaintiff stated that she can no longer carry a whole container of detergent and she has

to pour the detergent into a cup to transport it.  (Id.).  Plaintiff testified that she cooks, but she

tries to cook meals that do not require standing for long periods.  (Id.).  Plaintiff stated that her

mother helps her with many tasks.  (Id.).  Plaintiff testified that she shops for groceries.  (Id.).

Plaintiff stated that she leans on the shopping cart when grocery shopping, and that she sits down

on a bench outside the store if she becomes tired.  (Tr. 243).

Plaintiff testified that on a typical day, she wakes up at about noon, brushes her teeth,

washes her face, takes a shower, dresses, and lies down with a pillow between her legs to relieve pressure. (Id.). Plaintiff stated that she then gets up and eats. (Id.). Plaintiff testified that she tries to walk around a little, and then sits back down and watches television or reads. (Id.). Plaintiff stated that her days are spent alternating between sitting, lying down, and walking around the house. (Id.). Plaintiff testified that she experiences difficulty putting on her shoes because she cannot bend over to tie her shoes. (Id.). Plaintiff stated that she usually lies down for periods of about 15 to 20 minutes to relieve her pain. (Tr. 244). Plaintiff testified that she usually goes to sleep at about 2:00 a.m. (Id.). Plaintiff stated that she gets up to use the restroom and tosses and turns throughout the night. (Id.). Plaintiff testified that she places a pillow between her legs and elevates her right leg with pillows. (Id.). Plaintiff stated that she gets up in the middle of the night and walks around. (Id.). Plaintiff testified that she has been experiencing difficulty sleeping since she fell, which was about a year prior to the hearing. (Tr. 245).

The ALJ then examined plaintiff, who testified that she was terminated from her last job. (Id.). Plaintiff stated that she did not file for unemployment compensation, but that she did file for workers' compensation. (Tr. 246). Plaintiff explained that her workers' compensation claim is pending and that it has not been settled. (Id.). Plaintiff stated that she worked part-time as a cashier from December 1998 to July 1999. (Id.). Plaintiff testified that she also worked as a packer for a temporary service on and off for about three years. (Id.).

Plaintiff stated that she last saw Dr. Kitchens in March of 2003. (Id.). Plaintiff testified that she has not seen any other doctors since then. (Id.). Plaintiff stated that Dr. Kitchens recommended surgery but told her that she has to lose weight before she can undergo surgery. (Tr. 247). Plaintiff testified that Dr. Kitchens told her that until she loses weight, the only thing

he can do for her is prescribe medication. (Id.). Plaintiff stated that she has attempted to lose weight. (Id.). Plaintiff testified that she tried walking and she has tried to eat differently. (Id.). Plaintiff stated that she saw a weight loss professional who recommended a diet that did not require strenuous exercise. (Id.). Plaintiff testified that she has traveled to attend doctor appointments and to visit family members in Cape Girardeau. (Id.). Plaintiff stated that she drives back and forth from Jefferson City to Cape Girardeau with her mother, and that they take breaks during the drive. (Tr. 247-48).

Plaintiff's attorney indicated that he had no further questions and that the medical record was complete. (Tr. 248). The ALJ then concluded the hearing. (Tr. 249).

## B.    Relevant Medical Records

The record reveals that plaintiff presented to Paul A. Spence, M.D. on March 25, 2002, complaining of injuries sustained as a result of a fall at work. (Tr. 173). Plaintiff reported that she injured her right lower back and right arm. (Id.). Dr. Spence found "no specific obvious injuries," although he noted some possible swelling around the hand and wrist. (Id.). Dr. Spence found that plaintiff had good range of motion in all joints, but with some guarding. (Id.). No tenderness, joint effusion, or discoloration was found. (Id.). X-rays of the right upper extremity revealed no bony injuries and no evidence of any fractures. (Id.). Dr. Spence prescribed Darvocet[7] and restricted plaintiff's lifting with her right arm to no more than 25 pounds. (Id.). Dr. Spence stated that plaintiff may return to work and, after seven days, she may return to full duty. (Id.).

Plaintiff presented to David O. Catron, M.D. on April 11, 2002, complaining of right

---

[7]Darvocet is indicated for the relief of mild to moderate pain. See Stedman's at 402.

lower back pain. (Tr. 172). Dr. Catron noted that plaintiff has a very short torso with some excess lumbar[8] lordosis.[9] (Id.). Dr. Catron found tenderness over the right sacroiliac (SI) joint,[10] and plaintiff reported pain on forward flexion and extension. (Id.). Dr. Catron's assessment was right SI joint strain. (Id.). Dr. Catron recommended that plaintiff continue regular duty but be careful lifting. (Id.). Dr. Catron prescribed Naprosyn[11] and sent plaintiff to physical therapy. (Id.).

Plaintiff saw Dr. Catron on April 26, 2002, for a follow-up visit regarding her back injury. (Tr. 171). Dr. Catron noted that plaintiff had improved with physical therapy and was still working at her regular job. (Id.). Dr. Catron found slight tenderness over the right SI joint. (Id.). Dr. Catron's impression was right SI joint strain. (Id.). Dr. Catron recommended that plaintiff continue to work, continue physical therapy, and start a home exercise program. (Id.).

Plaintiff participated in physical therapy at Jackson Physical Therapy from April 11, 2002 through June 27, 2002. (Tr. 135-165). Plaintiff was instructed on proper lifting techniques and

---

[8]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[9]The normal, anteriorly convex curvature of the lumbar segment of the vertebral column. Stedman's at 1032

[10]The sacroiliac joint is the joint uniting the surface of the sacrum and that of the ilium, or hip bone. See Stedman's at 875, 937.

[11]Naprosyn is a nonsteroidal anti-inflammatory drug indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and juvenile arthritis. See PDR at 2874-75.

home exercises.  (Id.).  Plaintiff's physical therapists noted improvement, but also noted that plaintiff continued to complain of pain.  (Id.).  On June 27, 2002, plaintiff's final physical therapy session, plaintiff's physical therapist stated that plaintiff's pain continues to vary in intensity but remains at the moderate to intense level.  (Tr. 135).  It was noted that plaintiff began to have radicular symptoms at that time and that plaintiff was unable to progress because pain continued to be persistent.  (Id.).  Plaintiff's physician was contacted and indicated that plaintiff should hold off on physical therapy until she received the results of her MRI.  (Id.).

Plaintiff presented to R. August Ritter, M.D. on April 16, 2002, upon the referral of Dr. Catron, for treatment of her back and leg pain.  (Tr. 183).  Plaintiff's medications were listed as Naprosyn, Flexeril,[12] and Darvocet.  (Id.).  Plaintiff complained of a sharp pain in her right buttock region through the right leg, which she rated as an 8 on a scale of 1 to 10 at the time, 10 at worst, and 7 at best.  (Id.).  Plaintiff's straight leg raise was negative on the left and positive on the right for buttock and thigh pain.  (Id.).  Diffuse tenderness with palpation throughout the right buttock and right paralumbar region was noted.  (Id.).  Light touch was diminished over the entire right lower extremity from the thigh distally.  (Id.).  Dr. Ritter found central disc herniations at L4-5[13] and L5-S1[14] with spondylolisthesis at L5-S1.  (Id.).  Dr. Ritter noted low back and radiating right leg pain due to central disc herniations at L4-5 and L5-S1, as well as obesity.  (Id.).

---

[12]Flexeril is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions.  See PDR at 1930-31.

[13]Abbreviation for lumbar vertebra (L1 to L5).  Stedman's at 956.

[14]Abbreviation for sacral vertebra (S1-S5).  Stedman's at 1586.

Dr. Ritter recommended an epidural steroid injection[15] and advised plaintiff to remain off work. (Id.).

Plaintiff saw Dr. Catron on June 14, 2002, at which time she complained of back pain. (Tr. 170). Dr. Catron stated that plaintiff reported increased pain, although she "may or may not be doing her home exercises." (Id.). Dr. Catron stated that x-rays of the lumbar spine revealed a grade I to II L5-S1 spondylolisthesis. (Id.). Dr. Catron noted that the SI joints "look okay and the vertebra otherwise look normal." (Id.). Dr. Catron's assessment was: right SI joint pain and L5-S1 spondylolisthesis. (Id.). Dr. Catron continued plaintiff on Naprosyn and placed her on light duty for two weeks. (Id.).

Plaintiff saw Dr. Catron on June 28, 2002, for a follow-up regarding her back pain and right leg pain. (Tr. 169). Dr. Catron stated that plaintiff is not getting better, and is still having a lot of pain in the right side of her back that goes down her right leg. (Id.). Dr. Catron found tenderness over the right SI joint, and somewhat over the midline. (Id.). Dr. Catron's assessment was spondylolisthesis, L5-S1. (Id.). Dr. Catron scheduled an MRI of plaintiff's back and restricted plaintiff to light duty. (Id.).

Plaintiff underwent an MRI of the lumbar spine on July 1, 2002, which revealed a central disc protrusion at L4-5, and a Grade I spondylolisthesis due to bilateral spondylolysis of L5 with mild bilateral foraminal stenosis[16] and a central disc protrusion at L5-S1. (Tr. 197).

The records of Dr. Ritter from July 3, 2002, indicate that plaintiff was discharged from her

_____

[15]Injection of cortisone in the epidural space, which is the area surrounding the spinal cord. See Stedman's at 605.

[16]Narrowing of the spinal canal. See Stedman's at 1695.

- 10 -

job at the Lutheran Home on this date.  (Tr. 180).

Plaintiff was seen on July 8, 2002 with complaints of right lower back pain radiating down into the leg.  (Tr. 168).  Plaintiff's medications were listed as Naprosyn, Flexeril, and Darvocet.  (Id.).  Plaintiff reported that the medications were not working and that she was in too much pain to work.  (Id.).  Tenderness was found in plaintiff's right lower back, but reflexes were considered normal.  (Id.).  The assessment was disk protrusion at L4-5.  (Id.).  It was recommended that plaintiff not work.  (Id.).  Flexeril was prescribed.  (Id.).

Plaintiff was referred to Terry L. Cleaver, M.D. by Dr. August Ritter on August 13, 2002, for a lumbar epidural steroid injection.  (Tr. 177).  Dr. Cleaver noted that plaintiff was morbidly obese and had right L5 lumbar radicular pain distribution.  (Id.).  Dr. Cleaver's diagnosis was lumbar radiculopathy.  (Id.).  Dr. Cleaver administered a lumbar epidural steroid injection.  (Tr. 178).

Plaintiff saw Dr. Ritter on September 3, 2002, at which time she complained of pain in her back that radiates to her right buttock, thigh, and calf, with numbness throughout her entire right leg.  (Tr. 182).  Dr. Ritter found no sign of strength deficit in either extremity, no sign of knee or hip disorder, and negative straight leg raising.  (Id.).  Dr. Ritter's diagnosis was central disk herniation at L4-5 and L5-S1 with spondylolisthesis at L5-S1.  (Id.).  Dr. Ritter noted that plaintiff had poor improvement with her first epidural injection and recommended that plaintiff undergo another injection.  (Id.).  Dr. Ritter stated that plaintiff should not work in the interim.  (Id.).

Dr. Ritter's records indicate that the Lutheran Home called to inform Dr. Ritter that plaintiff had been using her time off work to travel long distances, and that plaintiff should thus be

capable of performing light duty work. (Tr. 181). Plaintiff saw Dr. Ritter on September 19, 2002, at which time she complained primarily of right buttock pain. (Tr. 181). Dr. Ritter found that plaintiff's gait was good. (Id.). Dr. Ritter found that plaintiff's strength was normal, and straight leg raising was negative. (Id.). Dr. Ritter noted that there were "significant inconsistencies between her subjective complaints and her objective findings." (Id.). Dr. Ritter also found significant evidence of self-limited behavior on strength testing. (Id.). Dr. Ritter noted no objective evidence of abnormality other than the MRI findings. (Id.). Dr. Ritter recommended a second epidural steroid injection, and limited plaintiff to sedentary activity, with no bending. (Id.).

Plaintiff saw Dr. Cleaver on November 7, 2002 for a lumbar epidural steroid injection. (Tr. 176). Dr. Cleaver noted that plaintiff reported no real improvement in her symptoms after the last injection. (Id.). Dr. Cleaver's diagnosis was lumbar radicular pain. (Id.). Dr. Cleaver administered a lumbar epidural steroid injection. (Id.).

Plaintiff saw Dr. Ritter on December 16, 2002, at which time she complained of pain in her back and right leg, and frequency of urination. (Tr. 179). Dr. Ritter noted that plaintiff complained of "diffuse pain throughout the entire post sacral and post lumbar region with even the lightest touch in a nonphysiologic pain symptom magnification behavior." (Id.). Dr. Ritter's diagnosis was: lumbar disk herniation[17] with sciatica,[18] spondylolisthesis lumbar spine L5-S1, and significant symptom magnification behavior. (Id.). Dr. Ritter recommended that plaintiff consider

---

[17]Protrusion of the lumbar disk. See Stedman's at 812.

[18]Pain in the lower back and hip radiating down the back of the thigh into the leg, usually due to herniated lumbar disk compromising a nerve root. See Stedman's at 1602.

surgical intervention, and referred plaintiff to a neurosurgeon. (Id.).

Plaintiff saw neurosurgeon Daniel L. Kitchens on January 30, 2003. (Tr. 187). Dr. Kitchens noted that plaintiff was not working and that she had tried epidural steroid injections, which did not help. (Id.). Dr. Kitchens stated that plaintiff was capable of returning to work on February 1, 2003, to perform light work. (Tr. 191). Dr. Kitchens expressed the opinion that plaintiff could lift 10 to 20 pounds and could infrequently strain, stoop, bend, twist, turn, push, pull, and climb. (Id.). Dr. Kitchens found that plaintiff should take a 15 minute break every two hours and that plaintiff should wear a brace during activity. (Id.).

Plaintiff was evaluated by Ronald C. Hertel of St. Louis-Clayton Orthopedic Group, Inc. on March 6, 2003. (Tr. 199). Dr. Hertel expressed the opinion that plaintiff had pre-existing spondylolisthesis, which was present prior to the injury she sustained on March 25, 2002. (Tr. 202). Dr. Hertel stated that the March 25, 2002 incident is a substantial factor in plaintiff's current symptomatology. (Id.). Dr. Hertel stated that plaintiff had no neurological findings. (Id.). Dr. Hertel stated that he concurred with the opinion of Dr. Kitchens that plaintiff is a poor surgical candidate, due to the fact that she is overweight and is a tobacco smoker. (Tr. 203). Dr. Hertel stated that Dr. Kitchens expressed the opinion that plaintiff should live with the pain with the following permanent restrictions: no lifting, bending, or stooping on a permanent basis; no prolonged standing or sitting; ability to get up and down at will. (Tr. 200). Dr. Hertel stated that the restrictions recommended by Dr. Kitchens are permanent and will not improve. (Tr. 203). Dr. Hertel stated that epidural steroids will not improve plaintiff's symptoms. (Id.). Dr. Hertel recommended the performance of a Functional Capacity Evaluation to determine the level at which plaintiff can return to work. (Id.).

Plaintiff saw Dr. Kitchens for a follow-up on March 6, 2003. (Tr. 204). Plaintiff continued to complain of pain in her back. (Id.). Dr. Kitchens noted that plaintiff had been wearing a back brace, although it was unclear whether it was offering much benefit. (Id.). Dr. Kitchens stated that plaintiff's neurologic exam was without changes. (Id.). Dr. Kitchens recommended that plaintiff continue with permanent work restrictions, and if her work cannot honor those restrictions then plaintiff should discontinue working. (Id.). Dr. Kitchens noted that plaintiff was scheduled to undergo one more epidural injection on March 27, 2003. (Id.).

On March 11, 2003, Robert Silvers, M.D., a non-examining state agency medical consultant, completed a Physical Residual Functional Capacity Assessment. (Tr. 86-93). Dr. Silvers expressed the opinion that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and push or pull an unlimited amount. (Tr. 87). Dr. Silvers found that plaintiff could frequently balance; occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. (Tr. 88). Dr. Silvers stated that plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 89-90).

Plaintiff saw Brenda L. Woods, D.O. on April 28, 2003. (Tr. 206-210). Dr. Woods diagnosed plaintiff with spondylolisthesis, mechanical low back pain, lumbar disc syndrome,[19] deconditioning syndrome,[20] depression, morbid obesity, and derangement 5.[21] (Tr. 209). Dr.

---

[19]Synonym for sciatica. See Stedman's at 1752.

[20]Syndrome by which individuals respond to pain by significantly limiting physical activities, resulting in decreased pain tolerance. See Stedman's at 395.

[21]Unilateral or asymmetrical pain across L4-5, with or without buttock or thigh pain, with leg pain extending below the knee. See Gerald W. Browning, Mechanical Low Back Pain (2003),

Woods noted that plaintiff did not tolerate sitting for more than 10 minutes. (Id.). Dr. Woods stated that plaintiff's leg symptoms are referred and not radicular. (Tr. 210). Dr. Woods noted that plaintiff demonstrated positive Waddell signs[22] during her testing procedure. (Tr. 219). Dr. Woods stated that plaintiff was at a stand still in the medical care that can be provided to treat her back until she stops smoking and loses some weight. (Id.). Dr. Woods stated that plaintiff may also benefit from treatment of her depression. (Id.). Dr. Woods expressed the opinion that plaintiff could return to work with the following restrictions: light work with lifting 0 to 10 pounds frequently and 10 to 20 pounds occasionally; change positions frequently; and avoid prolonged and repetitive bending at the waist. (Id.). Dr. Woods stated that plaintiff's prognosis for improvement is guarded. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant was insured for a Period of Disability and Disability Insurance Benefits on July 8, 2002, but was no longer so insured after June 30, 2003.

2.  The claimant has not engaged in substantial gainful activity since July 8, 2002. 20 C.F.R. §§ 404.1520(b), 416.920(b).

3.  The claimant has been more than minimally limited by disc herniations at L4-S1, spondylolisthesis at L5-S1 and obesity. 20 C.F.R. §§ 404.1520(c), 416.920(c). Thus, she satisfies the requirement for a severe impairment.

4.  The claimant's condition has not met or medically equaled a listing in 20 C.F.R. pt. 404, subpt. P, app. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d).

5.  The claimant's allegations are not entirely credible. Polaski v. Heckler, 751 F.2d

available at http://www.vhct.org/case1699/3LBPsyndromes.shtml.

[22]Waddell signs indicate complaints of back pain that are not caused by physical abnormality. See Attorneys Medical Deskbook § 11:2 (3d) (2003).

943, 948 (8th Cir. 1984); 20 C.F.R §§ 404.1529, 416.929.

6.    Since July 8, 2002, the claimant has had the residual functional capacity to lift, carry, push or pull twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour day, stand or walk a total of two hours in an eight-hour day, and occasionally stoop.  20 C.F.R. §§ 404.1567, 416.967.

7.    The claimant has been unable to perform her past relevant work since July 8, 2002. 20 C.F.R. §§ 404.1520(e), 416.920(e).

8.    The claimant is a twenty-four year old individual, which is defined as a younger individual.  20 C.F.R. §§ 404.1563, 416.963.

9.    The claimant has more than a high school education.  20 C.F.R. §§ 404.1564, 416.964.

10.   The claimant has been able to perform work existing in significant numbers in the national economy since July 8, 2002.  20 C.F.R. §§ 404.1520(f), 416.920(f).  This finding is based on the framework of Medical-Vocational Rules 202.21 and 202.22 of 20 C.F.R. pt. 404, subpt. P, app. 2, Table No. 2.

11.   The claimant has not been disabled as defined in the Social Security Act since July 8, 2002, and thus is not entitled to, or eligible for, a Period of Disability, Disability Insurance Benefits or Supplemental Security Income.

(Tr. 15-16).

The ALJ's final decision reads as follows:

The claimant's applications for a Period of Disability, Disability Insurance Benefits and Supplemental Security Income, filed on February 7, 2003 and October 28, 2002, respectively, are denied in that the claimant has not been disabled in accordance with the Social Security Act.  Thus, the claimant is not entitled to, or eligible for, a Period of Disability, Disability Insurance Benefits or Supplemental Security Income.

(Tr. 16).


## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).   The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878

(8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.


**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.

See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy

taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree

of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See</u> <u>id.</u> Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. <u>See</u> <u>id.</u> If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); <u>Jones v. Callahan</u>, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.      <u>Plaintiff's Claims on Appeal</u>

Plaintiff raises three claims on appeal of the Commissioner's decision. Plaintiff first argues that the ALJ erred in assessing plaintiff's residual functional capacity. Plaintiff next argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible. Finally, plaintiff argues that the ALJ erred in finding that plaintiff had no non-exertional impairments and in relying on the medical-vocational guidelines (grids) at step five of the sequential evaluation process. The undersigned will address each claim in turn, beginning with the ALJ's credibility assessment.

1.    **Credibility Assessment**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Plaintiff specifically argues that the ALJ erred by not properly considering the Polaski factors in making his determination.  Defendant argues that the ALJ made a proper credibility determination and found that plaintiff's allegations of pain were not fully credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.

Under Polaski, an ALJ must also consider a claimant's prior work record, observations by third parties and treating and examining doctors, and the claimant's appearance and demeanor at the hearing.  739 F.2d at 1322.  In evaluating the evidence of nonexertional impairments, the ALJ

is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole.  Plaintiff claims that the ALJ erred in finding that plaintiff's subjective complaints of disabling pain are not fully supported by the evidence, despite the objective medical evidence of plaintiff's impairments.  Plaintiff mischaracterizes the nature of a finding of pain in the medical evidence.  "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work."  Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In this case, the ALJ properly pointed out Polaski factors and other inconsistencies in the record as a whole which detract from plaintiff's complaints of disabling pain.  The ALJ first discussed the medical evidence.  The ALJ stated that physical examinations conducted by Dr. Ritter reveal that, although plaintiff complained of lower bak and right leg pain, he found no evidence of a right hip or right knee disorder, a good gait, negative straight leg raise testing on all but one occasion, no evidence of muscle atrophy or circulatory dysfunction, no muscle spasm, and functional reflexes.  (Tr. 181-83).  The ALJ also noted that Dr. Ritter found that plaintiff had 5/5 right lower extremity strength on all but one occasion, and on that occasion he attributed the

reduction in strength to symptom magnification because plaintiff's gait indicated normal right lower extremity strength.  (Id.).  The ALJ next stated that physical examinations conducted by Dr. Cleaver demonstrated no musculoskeltal or neurologic abnormality other than L5 radicular pain. (Tr. 177).  In addition, the ALJ noted that Dr. Hertel's records demonstrate that plaintiff had a negative straight leg raise test, no lower extremity motor weakness, normal ankle reflexes, and an ability to walk on her heels, albeit with difficulty.  (Tr. 201).  The ALJ next stated that Dr. Woods expressed the opinion that plaintiff's leg symptoms were not due to radiculopathy.

(Tr. 210).  Finally, the ALJ noted that Dr. Kitchens found that plaintiff had no evidence of nerve root compromise.  (Tr. 202).

The ALJ next discussed plaintiff's daily activities.  The ALJ stated that plaintiff testified that she drives, sweeps, cleans tables, launders, cooks, and shops for groceries.  The ALJ noted that the fact that plaintiff is able to shop for groceries is especially inconsistent with plaintiff's allegation that she is unable to walk more than five to ten minutes at a time. The ALJ also pointed out that plaintiff resides in a third-floor apartment and did not indicate she is unable to climb the three flights of stairs to the apartment.  In addition, the ALJ noted that plaintiff traveled long distances and vacationed in the summer of 2002.  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  The ALJ also mentioned that plaintiff worked for several months after sustaining her allegedly disabling injury.  The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain.  See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

The ALJ next addressed the side effects of plaintiff's medications.  The ALJ noted that,

although plaintiff claims that she has experienced nervousness and drowsiness, the medical record does not show any such complaints were made to her physicians. The absence of side effects from medication is a proper factor to be considered in evaluating subjective complaints of pain. See McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000). Finally, the ALJ pointed out that plaintiff has continued to smoke despite the fact that her continued smoking negates surgical intervention. The failure to follow a prescribed course of treatment, including the cessation of smoking, is a relevant factor in assessing the credibility of a claimant's subjective complaints. See Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000); The ALJ thus concluded that plaintiff's allegations were "not entirely credible." (Tr. 16).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not fully credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2. Residual Functional Capacity

Plaintiff argues that the ALJ erred by assessing a residual functional capacity that was not based on the medical evidence of record and did not comply with the standards contained in Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). Plaintiff

also argues that the ALJ failed to give proper weight to the opinions of Dr. Kitchens and Dr. Woods. Defendant argues that the ALJ assigned proper weight to the medical opinions of records and correctly determined plaintiff's residual functional capacity.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer, 245 F.3d at 704). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

"A treating physician's opinion is generally entitled to substantial weight; however, such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data." Davis v. Shalala, 31 F.3d 753, 756 (8th Cir. 1994). Further, such opinions may also be discounted when a treating physician renders inconsistent opinions. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). An ALJ is also free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Singh, 222 F.3d at 452 (quoting Kelley, 133 F.3d at 589).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See

Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). However, an ALJ is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6)(2002).

On January 30, 2003, Dr. Kitchens expressed the opinion that plaintiff could return to work with a twenty-pound lifting restriction, but that she could only stoop, bend, twist, turn, and climb stairs and ladders on a less-than-occasional basis. (Tr. 191). Dr. Kitchens further found that plaintiff could not sit or stand for prolonged periods and that she would require a fifteen-minute break every two hours. (Id.). The ALJ indicated that he was assigning "virtually no weight" to this opinion because Dr. Kitchens did not provide any objective data to support his opinion. (Tr. 14). The ALJ also stated that Dr. Kitchens based the above-described limitations on plaintiff's obesity and spondylolisthesis rather than disc herniations. (Tr. 191). The ALJ noted that plaintiff's spondylolisthesis has existed since her birth and the obesity has existed well before July 2002 and has not precluded plaintiff from working in the past. Further, the ALJ pointed out that Dr. Kitchens opinion is internally inconsistent, as he found that plaintiff could not sit or stand for prolonged periods, but he stated that she did not require an option to sit from one position to

another.  (Tr. 191).

The ALJ erred in assigning no weight to Dr. Kitchens' opinion.  It is true that Dr.

Kitchens did not provide any objective data to support his opinion.  All of the other factors,

however, weigh in favor of according significant weight to his opinion.  Specifically, Dr. Kitchens

is a treating physician, he is a specialist in neurology, and his opinion is supported by the record as

a whole.  Although Dr. Kitchens listed plaintiff's diagnosis as spondylolisthesis, he also noted

plaintiff's 2002 fall in treatment notes.  (Tr. 187).  As such, the ALJ erred in assigning "virtually

no weight" to Dr. Kitchens' opinion.

Dr. Woods expressed the opinion that plaintiff could return to work with the following

restrictions: light work with lifting 0 to 10 pounds frequently and 10 to 20 pounds occasionally;

change positions frequently; and avoid prolonged and repetitive bending at the waist.  (Tr. 209).

Dr. Woods stated that plaintiff's leg symptoms are not radicular.  (Tr. 210).  Dr. Woods noted

that plaintiff demonstrated positive Waddell signs during her testing procedure.  (Tr. 219).  The

ALJ indicated that he was according slight weight to Dr. Woods' opinion that plaintiff must

change positions frequently, due to her finding that plaintiff exhibited positive Waddell signs

during testing.  (Tr. 14).  The ALJ did not err in according slight weight to the opinion of Dr.

Woods, given the fact that plaintiff only saw Dr. Woods one time for a residual functional

capacity consultation at which positive Waddell signs were noted.

Dr. Silvers, the state agency medical consultant, expressed the opinion that plaintiff could

not climb ladders, ropes, or scaffolds, but that she could lift, carry, push or pull twenty pounds

occasionally and ten pounds frequently, sit six hours in an eight-hour day stand or walk a total of

six hours in an eight-hour day frequently balance, and occasionally stoop, kneel, crouch, crawl

and climb ramps or stairs. (Tr. 87-90).

After discussing the objective medical evidence and plaintiff's own statements regarding her impairments, the ALJ concluded:

> [i]n light of the foregoing, the undersigned finds that, since July 8, 2002, the claimant has had the residual functional capacity to lift, carry, push or pull twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour day, stand or walk a total of two hours in an eight-hour day, and occasionally stoop. This constitutes a limited range of light work as that term is defined by the regulations. <u>See</u> 20 C.F.R. §§ 404.1567, 416.967.

(Tr. 15).

The ALJ's residual functional capacity determination is not supported by substantial evidence. Although every physician who provided an opinion regarding plaintiff's functional limitations, including Dr. Kitchens, Dr. Woods, and Dr. Silvers, found that plaintiff was capable of lifting up to twenty pounds occasionally, none of plaintiff's treating physicians expressed the opinion that plaintiff could sit six hours in an eight-hour workday, or stand or walk two hours in eight-hour workday. Dr. Kitchens found the additional limitations that plaintiff could infrequently strain, stoop, bend, twist, turn, push, pull, and climb, and that plaintiff requires a fifteen-minute break every two hours. (Tr. 191). The only support for the ALJ's determination is the opinion of the non-examining state agency medical consultant, Dr. Silvers, who based his opinion solely upon a review of plaintiff's medical records. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." <u>Singh</u>, 222 F.3d at 452 (quoting <u>Kelley</u>, 133 F.3d at 589).

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to accord proper weight to the opinion of Dr. Kitchens and to formulate a new residual functional capacity based on the medical evidence in the record.

### 3. Lack of Vocational Expert Testimony

Plaintiff lastly argues that the ALJ erred by using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because plaintiff has significant non-exertional impairments. Specifically, plaintiff argues that plaintiff has postural limitations and experiences depression and pain. Plaintiff contends that the ALJ's use of the Medical-Vocational Guidelines, commonly known as the "Grids," to determine that plaintiff was capable of performing other work, was error. Plaintiff argues that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the Medical-Vocational Guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are non-exertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit

requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a non-exertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)).

The undersigned finds that the ALJ committed error by not eliciting the testimony of a vocational expert. The ALJ acknowledged that plaintiff suffers from disc herniations at L4-S1 and spondylolisthesis at L5-S1. Plaintiff experiences significant pain due to these back impairments. Pain has been found to be a non-exertional impairment. See Gray v. Apfel, 192 D.3d 799, 802 (8th Cir. 1999). In addition, Dr. Kitchens found that plaintiff is limited in her ability to sit, stand, stoop, strain, bend, twist, turn, push, pull, and climb, due to her back impairments. As such, plaintiff cannot perform the full range of light work. The ALJ's finding that plaintiff was able to perform other work existing in significant numbers in the national economy in spite of her nonexertional impairments thus "invaded the province of the vocational expert" and was improper. Foreman, 122 F.3d at 26 (quoting Sanders v. Sullivan, 983 F.2d 822, 824 (8th Cir. 1992)).

As discussed above, the ALJ formulated a residual functional capacity that was not supported by substantial evidence. Based on this erroneous residual functional capacity, he then applied the Medical-Vocational Guidelines and determined that plaintiff could perform other work existing in significant numbers in the national economy. As a result, the undersigned recommends that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to reassess plaintiff's residual functional capacity and to adduce the testimony

of a vocational expert to determine how plaintiff's nonexertional impairments restrict her ability to perform jobs in the national economy.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 605 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation and further that the court not retain jurisdiction of this matter.

The parties are advised that they have eleven (11) days, until August 25, 2006, to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this 14th day of August, 2006.

Lewis M. Blanton
_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE